**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

MARY WILLIAMS,              )
                  )
      Plaintiff,        )
                  )
v.                  )
                  )
                  )
CAROLYN W. COLVIN,     )
  Acting Commissioner of Social Security )
                  )
      Defendant.      )

CASE NO. 1:15CV68

JUDGE DONALD C. NUGENT

MAGISTRATE JUDGE GREG WHITE

**REPORT & RECOMMENDATION**

Plaintiff Mary Williams ("Williams") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying Williams' claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## I.  Procedural History

On August 20, 2012, Williams filed an application for POD and DIB alleging a disability onset date of August 17, 2012 and claiming that she was disabled due to Crohn's disease, HIV infection, and "cides." (Tr. 74, 82.)  Her application was denied both initially and upon reconsideration. (Tr. 74-95.)

On August 13, 2014, an Administrative Law Judge ("ALJ") held a hearing during which Williams, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 37-

73.) On August 27, 2014, the ALJ found Williams was able to perform her past relevant work, as well as a significant number of jobs in the national economy, and, therefore, was not disabled. (Tr. 20-32.) The ALJ's decision became final when the Appeals Council denied further review. (Tr. 1-7.)

## II.  Evidence

### Personal and Vocational Evidence

Age forty-nine (49) at the time of her administrative hearing, Williams is a "younger" person under social security regulations. *See* 20 C.F.R. § 404.1563(c). Williams has a high school education, and completed some college courses. Her past relevant work includes clerk typist and hand finisher of plastic products.  (Tr. 29-30.)

### Medical Evidence

Williams began treatment with Jennifer A. Hanrahan, D.O., in the infectious diseases department at MetroHealth Medical Center ("MetroHealth") on April 11, 2012.  (Tr. 397-99.) Dr. Hanrahan noted that Williams suffered from HIV, hypertension, and Crohn's disease. Williams was recovering from a recent two-week hospitalization due to a Crohn's disease flare-up. Williams underwent a partial colectomy and terminal ileal resection on March 19, 2012, that was complicated postoperatively by deep venous thrombosis (DVT) in Williams' left leg. (Tr. 397.)

At her appointment with Dr. Hanrahan, Williams reported that she was doing well. (Tr. 397.)  Her medical records indicated that she did not have a detectable viral load on either of her previous two visits, on August 15, 2011 and December 14, 2011. (Tr. 398.)  Williams had suspended her Imuran and Mesalamine, but was taking Prednisone. (Tr. 397.)  Dr. Hanrahan described Williams as alert with no distress.  (Tr. 397.) She observed that Williams was doing well in terms of her Crohn's disease.  (Tr. 399.)

Williams returned for a follow-up visit with Dr. Hanrahan on June 27, 2012.  Dr. Hanrahan reported that Williams was doing well with no changes from her previous visit. (Tr. 357.)  She further reported that Williams was "doing very well" with her Crohn's disease.  (Tr.

2

358.) Dr. Hanrahan's physical examination yielded normal results. Williams was instructed to continue her current antiretroviral regimen. (Tr. 357-358.)

On July 30, 2012, Williams began treatment with Roy D. Ferguson, D.O., in the Gastroenterology Department at MetroHealth.  (Tr. 350).  Dr. Ferguson observed that Williams had not experienced any recurrence of her Crohn's disease symptoms since her surgery.  *Id*. However, based upon her significant history with the disease, Dr. Ferguson opined that Williams should stay on maintenance therapy.  Accordingly, Williams resumed her Imuran treatment. (Tr. 352.)  On September 26, 2012, Dr. Ferguson indicated his intent to increase the prescribed dosage of Imuran, but expressed caution due to Williams' HIV and history of leukopenia.  (Tr. 274.)  Dr. Ferguson observed that Williams was doing well, with no symptoms. He noted some weight gain and the fact that Williams continued to smoke cigarettes. (Tr.  272.)

Williams scheduled an emergency appointment with Dr. Hanrahan on October 29, 2012 due to vaginal discharge, which had continued over the course of the previous two weeks.  Dr. Hanrahan's physical examination at the appointment yielded normal results. (Tr. 607-608.)

On November 18, 2012, state agency reviewing physician, Elaine M. Lewis, M.D., considered the record and determined that Williams was not disabled. (Tr. 74-80.) Dr. Lewis concluded that Williams could perform a range of light work,[1] but should avoid concentrated exposure to fumes, dusts, gases and poor ventilation, and even moderate exposure to hazards, like machinery and heights, due to her long-term use of anticoagulants. (Tr. 77-78.)

On December 9, 2012, Williams attempted suicide by taking somewhere between five (according to her discharge summary - Tr.  537), and twenty (according to her admission

---

[1]20 C.F.R. §404.1567(b), captioned "Light work,"  reads, in its entirety:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

paperwork - Tr. 525), anticoagulant tablets. During her hospitalization, Williams had a consultation with Upma Dhingra, M.D., in the psychiatry department of Euclid Hospital. (Tr. 548-551.)  Williams stated that she had been depressed for the last few months due to a number of stressors, including one son going to jail, one son joining the Marines, her ex-husband (with whom she lived) not caring for her, and her daughter keeping her grandchildren away.  (Tr. 548.)  Williams also reported that she had increased her drinking and thought that might have contributed to her problems.  *Id.*  Dr. Dhingra opined that Williams would benefit from outpatient psychiatric counseling.  (Tr. 549.)  Williams was discharged on December 11, 2012, with a diagnosis of major depressive disorder and alcohol abuse and a recommendation for outpatient psychiatric treatment.  (Tr. 537-538.)

At an appointment on January 9, 2013, Williams submitted disability forms to be completed by Dr. Hanrahan.  Williams reported that she is unable to work "because whenever she works too much, she ends up in the hospital with a Crohn's flare."  (Tr. 599.)  Williams also complained of pain in all her joints, large and small, which was worse in the morning and resolved after some time.  *Id.*  Dr. Hanrahan suspected that the joint pain was related to Williams' Crohn's disease, and referred her to the arthritis clinic.  Dr. Hanrahan also prescribed Chantix, in response to Williams' effort to stop smoking cigarettes.  (Tr. 600.)

Dr. Hanrahan completed a two-page form captioned "Medical Source Statement: Patient's Physical Capacity."[2]  (Tr. 575-576.)  Dr. Hanrahan indicated that Williams could lift a maximum of five pounds frequently, and stand for one hour without interruption. (Tr. 575.)  The inquiry regarding the total number of hours in an eight-hour work day that Williams could stand was left blank.  Dr. Hanrahan limited Williams to occasional climbing, balancing, stooping, crouching, kneeling, and crawling.  *Id.*  Dr. Hanrahan also limited Williams to occasional reaching, pushing/pulling, fine and gross manipulation.  (Tr. 576.)  Dr. Hanrahan opined that Williams' ability to sit was unaffected by her impairments, but that she needed to alternate between sitting, standing, and walking.  *Id.*  Dr. Hanrahan observed that Williams experienced

---

[2]  The form was dated January 7, 2013, however it is more likely that it was misdated and prepared after Williams' appointment on January 9, 2013.

only moderate pain, but that the pain interfered with her concentration, took her off task, and caused absenteeism.  (Tr. 576.)  Next to each of the inquires regarding physical limitations, the form requests the medical findings that support the conclusions. Dr. Hanrahan did not provide any medical findings. (Tr. 575-576.)

On January 28, 2013, Williams saw John S. Maxwell, M.D., in the Gastroenterology Department of MetroHealth, for a follow-up appointment regarding her Crohn's disease. (Tr. 581-586.)  Dr. Maxwell noted that Williams' HIV and Crohn's disease were well controlled since her surgery.  (Tr. 581.)  Dr. Maxwell reported that Williams felt well, was not in pain, had rare constipation, and no blood in her stool. (Tr. 581.)  Dr. Maxwell considered increasing the dosage of Imuran and performing an annual surveillance colonoscopy for post-operative recurrence. (Tr.  586.)

On February 8, 2013, Williams began treatment with Sonia Manocha, M.D., in the arthritis clinic at MetroHealth. (Tr.  704-710.)  Williams reported two months of joint pain and stiffness, stating that she experienced swelling in her proximal interphalangeal joints (PIPs) and thumbs, primarily after typing. (Tr.  704.)  Dr. Manocha's physical examination revealed full range of motion, and no swelling or tenderness, except in Williams' left Achilles and right hand. (Tr. 708.)  Dr. Manocha considered several possible etiologies for the joint pain, but acknowledged that irritable bowel disease arthritis was unlikely because Williams' Crohn's disease was currently under control.  (Tr. 710.)  She diagnosed polyarthritis and prescribed Diclofenac (a nonsteroidal anti-inflammatory drug).  (Tr. 704, 710.)

On February 25, 2013, Williams presented to Natalie Whitlow, Ph.D., for a consultative psychological examination.  (Tr.  621-628.) Dr. Whitlow's  report included a number of typographical errors, most notably, frequent references to "Chromes disease." (Tr. 621-627.)  The report also contained misinformation, specifically that Williams received a Bachelor's degree in Aeronautical Engineering from Cleveland State University in 2008 and that she worked as an aeronautical engineer.  (Tr.  622, 623.)  It is not clear from the report whether Williams told Dr. Whitlow that she had graduated from Cleveland State or Dr. Whitlow misunderstood the

5

information that Williams provided at the examination.  Williams apparently reported in error that she had been diagnosed with rheumatoid arthritis.  (Tr. 623.)

Williams told Dr. Whitlow that she was last employed in August of 2012, but that she stopped working due to physical medical issues.  Williams stated that she would still be working but for the fact that the parts were too heavy for her to carry and the work environment was too emotionally stressful, due to her Crohn's disease.  Williams did not report any history of disciplinary action or attendance issues.  (Tr. 623.)

At the time, Williams reported that she was prescribed Cetrizine HCL and Hydtoxytzine HCL (for allergies), Lisinopril (for hypertension), Azathioprine (for Crohn's disease), Atripla (for HIV), and Diclofenac for rheumatoid arthritis.  Williams provided no significant behavioral health history.  (Tr. 623.)

Williams reported to Dr. Whitlow that her mood was "generally content" but that she did experience "bouts of depression."  Williams further reported that her depression could get so severe that she experiences suicidal ideation.  (Tr. 625.)

Dr. Whitlow concluded that Williams' prognosis "was related to her physical health," an area that she was "not qualified to make a medical diagnosis."  Nonetheless, Dr. Whitlow opined that Williams' prognosis was poor because she had two illnesses that "have no cure and progressively get worst [sic] over time." (Tr.  626.)

Dr. Whitlow diagnosed "Mood Disorder due to HIV, Chromes Disease [sic], and Rheumatoid arthritis diagnoses," and assigned a Global Assessment of Functioning ("GAF") score of 45.[3]  (Tr. 625.)  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *See Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0-100,with lower numbers indicating more severe mental impairments.  A GAF score

---

[3] It bears noting that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") at 16 (American Psychiatric Association, 5th ed., 2013).

between 41 and 50 indicates serious symptoms, including suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning.

Dr. Whitlow characterized Williams' demeanor as "defensive and protective of herself and her self-image," (Tr. 624), but opined that Williams' cognitive functioning did not appear to be impaired.  (Tr. 625.)  Dr. Whitlow further found that Williams experienced no functional limitations in her ability to understand, remember, and carry out instructions; to maintain attention and concentration, persistence and pace to perform simple and multi step tasks; to respond to supervision and to coworkers; and, to respond to work pressures. (Tr. 627-628.)

On March 12, 2013, state agency psychologist, Karen Terry, Ph.D., reviewed the administrative record, including Dr. Whitlow's report. She concluded that Williams did not have a severe psychological impairment. Dr. Terry outlined Williams' activities of daily living, ability to understand, remember, and carry out instructions, and her ability to relate to others and adapt to change. (Tr. 89-90.)

At an appointment with Dr. Manocha on March 21, 2013, Williams complained of pain in her hands, elbows, and feet, and low back stiffness, which began two month prior to the appointment. (Tr. 724-727.)  Dr. Manocha reported that Williams had been doing better since her last visit, and that, according to Williams, Diclofenac reduced her pain by fifty percent. (Tr. 724-725.)  Williams noted that she had been under a lot of stress lately, caused by having to deal with social security, inability to work, financial issues, and trying to go back to school.  (Tr. 724.)

A March 21, 2013 x-ray of Williams' pelvis revealed mild hypertrophic spurring in the posterior facet joints of the lower lumbar spine at the levels of L3-L4 and L4-L5. (Tr. 730.)  An x-ray of Williams' right foot revealed a mild hallux valgus deformity with overlying soft tissue swelling at the first metatarsophalangeal joint (bunion).  *Id*.  Dr. Manocha opined that Williams joint complaints were most likely related to generalized osteoarthritis, and recommended continuing treatment with nonsteroidal anti-inflammatory drugs.  (Tr. 731.)

On March 29, 2013, state agency physician, Diane Manos, M.D., reviewed the administrative file and concurred with Dr. Lewis that Williams could perform a range of light

7

work, but should avoid concentrated exposure to fumes, dusts, gases and poor ventilation, and even moderate exposure to hazards, like machinery and heights, due to her long-term use of anticoagulants. (Tr. 91-92.)  She cited no material functional change on reconsideration of Williams' claim.  (Tr. 92.)

At an appointment on April 15, 2013, Dr. Hanrahan changed Williams' medication due to her weight gain.  Dr. Hanrahan also advocated diet and exercise, and advised Williams to stop smoking.  Williams reported a cough with congestion, which Dr. Hanrahan attributed to seasonal allergies. Williams did not report any joint pain, and Dr. Hanrahan's physical examination yielded normal results.  (Tr. 751-753.)

On July 15, 2013, Williams complained of ongoing coughing, sinus congestion, runny nose, and headache, that began three months prior to her appointment.  (Tr. 784.)  Based upon Williams' symptoms and history of allergy problems, Niraj Vora, M.D., in the Allergy/Immunology Department at MetroHealth, prescribed Flonase, and recommended epicutaneous testing.  (Tr. 787.) Dr. Vora noted that Williams' HIV and Crohn's disease were under control with medication.  (Tr. 784.)

On September 16, 2013, Williams reported increasingly severe joint pain. Dr. Hanrahan noted that no swelling was present, and reported that Williams had seen an allergist, but declined allergy testing.  After her consultation with Dr. Hanrahan, Williams expressed interest in undergoing allergy testing.  (Tr. 847.)

Williams was seen by Dr. Manocha at MetroHealth on October 3, 2013 and October 10, 2013 for joint pain involving her hands, knees, and feet. (Tr.  860, 872.) Williams reported that Diclofenac helped until noon, but then wore off. (Tr. 872.)  Dr. Manocha's physical examination revealed no joint swelling or edema. (Tr. 865, 872.)  Williams reported that morning stiffness in her hands and feet lasted for an hour, but was not severe. (Tr. 872.) Dr. Manocha also attributed Williams' joint pain to generalized osteoarthritis.  (Tr. 878.)  On October 31, 2013, Williams complained of pain radiating from her hips, difficulty bending, straightening up, and sitting, stiffness, pain in her feet after walking, back, hip, and knee pain, and difficulty dressing. (Tr.

903-904.) Williams then participated in physical therapy to reduce her pain and increase her functioning. (Tr.  900-935, 943-950, 962-964, 970-985).

On February 10, 2014, Dr. Hanrahan submitted a second "Medical Source Statement: Patient's Physical Capacity."  (Tr.  857-858.)  Two changes were made from the previous form. First,  Dr. Hanrahan wrote that Williams could stand for a total of four hours in an eight-hour workday.  (Tr. 857.)  Next, in response to the inquiry, "Please identify an additional limitations that would interfere with work 8 hours a day, 5 days a week," Dr. Hanarahan wrote "severe joint pain."  (Tr. 858.)  However, in response to the inquiry, "Does the individual experience pain" (roughly half way down the same page of the form), Dr. Hanrahan checked the box labeled "moderate."  *Id*.  Once again, all six of the boxes requesting medical findings that supported her assessment were left blank.  (Tr.  857-858.)

The record also includes an incomplete, undated, and unsigned form, captioned "Medical Source Statement: Patient's Mental Capacity."  (Tr. 1003-1004.)  The ALJ attributed the contents of this form to Dr. Hanrahan.  (Tr. 29.)  According to the report, Williams could rarely maintain regular attendance and be punctual within customary tolerance, deal with the public, or relate to coworkers.  (Tr. 1003.)  The form indicated that Williams would occasionally have difficulty following work rules, using judgment, maintaining attention and concentration for more than two hours, responding to changes in a routine setting, interacting with supervisors, functioning independently without redirection, working in proximity to other without distraction, dealing with stress, and completing a normal work day.  (Tr. 1003.)

At a February 20, 2014 appointment with Dr. Manocha, Williams left without being seen, due to confusion regarding her appointment time.  Before she left, Williams briefly mentioned that she had no acute complaints.  (Tr. 1005.)

On February 24, 2014, Williams saw a social worker, Rachel Calhoun, MSW, LISW, and told Ms. Calhoun that she was feeling "ok"  but had been under more stress lately. Williams identified her current stressors as the weather, her father being ill, and her mother's needs. Williams informed Calhoun that she had been more active, as she had obtained a membership at the YMCA for aerobics class. Williams also reported riding her bicycle when able. Williams told

Calhoun that she was doing well with her medications and had no new concerns with respect to that aspect of her care. (Tr. 1010.)

On April 14, 2014, Williams saw Dr. Hanrahan for a follow-up HIV appointment. The doctor noted that Williams was doing well with no change since her last visit. (Tr. 1042.) While Dr. Hanrahan noted Williams' concern about weight gain, she also reported that Williams was not exercising. (Tr. 1042.)

On June 2, 2014, Williams saw Dr. Hanrahan for an urgent HIV visit.  (Tr. 1056-1058.) Williams told Dr. Hanrahan that she was having perirectal pain and itching and that this had been getting worse.  (Tr. 1056.)  Williams also complained of bloating and diarrhea.  (Tr. 1056.) Although she reported that Williams was in no distress on physical examination, Dr. Hanrahan diagnosed multiple shallow perianal ulcers.  (Tr. 1056.)  Dr. Hanrahan changed Williams' antiviral medication to Truvada and commented that Williams' perirectal ulcers could be caused by Crohn's disease or HSV (herpes simplex virus).  (Tr. 1058.)  Dr. Hanrahan took an HSV culture and prescribed medication, without waiting for the culture results.  (Tr. 1058.)  On June 30, 2014, Williams reported that she felt better since changing her medication.  (Tr. 1060.)  She told Dr. Hanrahan that her abdomen seemed less distended and that her rash had resolved.  *Id*.

***Hearing Testimony***

During the August 13, 2014 hearing, Williams testified to the following:

• She was 5'1" and weighed 155 pounds.  She gained fifteen pounds in the last six months as a side effect of her medication.  (Tr. 42.)

• She had attended some college courses and received "A"s and "B"s.  (Tr. 43-44.)

• She left her last job because her employer would not clear her return to work after her 2012 surgery.  She was unable to lift and carry heavy plastic parts.  (Tr. 45, 49-50.)

• She still experiences Crohn's flares, resulting in diarrhea, which can occur daily, and intermittent constipation.  (Tr. 46, 58, 61.)  She experiences left side pain, the intensity of which she described as nine on a scale of ten (9/10).  (Tr. 46.)  The pain is constant, and only resolves when she goes to the emergency room.  (Tr. 46.)

• She conceded that her medications were effective.  (Tr. 47.)  She had an undetectable viral load as of the day of the hearing.  (Tr. 48-49.)

10

- She was not certain but thought she was diagnosed with HIV in 2004. (Tr. 49.)

- She uses an unprescribed cane at home to go up and down stairs.  (Tr. 48.) She conceded that she was not prescribed a TENS unit, and did not wear a back brace. (Tr. 48.)

- The only thing that resolves her pain is rest and medication.  (Tr. 51.)

- She estimated that she could lift five pounds, stand for five to ten minutes, walk a city block, and sit for ten minutes after which she would have to get up and stretch.  (Tr. 51-52.)

- She is prescribed Celexa for anxiety and depression. (Tr. 52.)  She sees a psychiatrist at MetroHealth, who is helping her develop coping skills.  (Tr. 53.) She has problems with crowds, which she defined as more than five people.  (Tr. 54.)

- She has breathing problems. She smokes less than a pack of cigarettes a day, and only when she is nervous.  (Tr. 54.)

- She does not sleep well, typically sleeping for four hours per night.  (Tr. 56. )

- Her activities of daily living include light housework, occasional visiting with family and friends, grocery shopping, light cooking, and caring for her mother. She enjoys reading and sewing, and going to the library, and she attends weekly church services.  (Tr. 56-58.)

- Her condition is worsening, and her hip is really bothering her.  (Tr. 58.)

- She suffers from joint pain, arthritis, and inflamation in the discs in her back, which causes numbness in her left side, hands and feet.  (Tr. 58, 61-62.)  It feels like walking on glass.  (Tr. 61.)

- As of the date of the hearing, she was prescribed Truvada and Tivicay (for HIV), Atorvastatin and Hydrochlorothiazide (for hypertension), Clonodine (for hypertension and hot flashes), Azathioprine (for Crohn's diease), and Cetirizine and Hyroxyzine (for allergies).  (Tr. 46, *citing* 251.)

- Her medication for Crohn's disease was increased, but increasing the dosage is a concern because her HIV medication "fights" her Crohn's disease medication. (Tr. 61.)  Due to the drug interaction, she must undergo an annual colonoscopy to check for polyps.  (Tr. 61.)

The VE testified that Williams had past relevant work as a finisher of plastic products

(medium, heavy as performed, semi-skilled) and clerk typist (sedentary, medium as performed,

semi-skilled). (Tr. 64-65.)  The ALJ then posed the following hypothetical:

[A]ssume an individual who is 49 years old, has a 12 year education plus one year of college, can read and write, perform arithmetic, has the work background to which you testified.  This individual can perform work of light exertional requirements but has additional nonexertional limitations; specifically no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs,

11

balancing, stooping, kneeling crouching and crawling; no concentrated exposure to temperature extremes, humidity, or environmental pollutants; no exposure to hazards, by which I mean to include heights, machinery, commercial driving. And she should be in a job that affords access to restroom facilities. Can this individual perform either of her past jobs?

(Tr. at 67.)  The VE testified that such an individual would be able to perform the clerk typist job as generally performed, but not as actually performed.  (Tr. 68.)  The VE further testified that Williams would be able to perform other jobs in the regional and national economy, including the jobs of mail clerk (light, unskilled), fitting room attendant (light, unskilled), and housekeeper/laundry aide (light, unskilled).  (Tr. 68-70.)

The ALJ then posed a second hypothetical:

[A]ssume the same individual, age, education, work background, and the same residual functional capacity provided to you previously with the additional limitation that due to symptoms of medically determinable impairments this individual will be off task at least 20 percent of the time.  Could this individual perform jobs existing in significant numbers in the economy?

(Tr. 70.)  The VE responded that the individual could not perform jobs existing in significant numbers in the economy.  *Id.*

Williams' attorney asked the VE to reduce the functional capacity in the first hypothetical to sedentary, and to add that the individual could only occasionally reach in all directions, push, pull, and perform fine and gross manipulations.  (Tr. 70-71.)  The VE responded that the individual would not be employable.  (Tr. 71.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

---

[4]  The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Williams was insured on her alleged disability onset date, August 17, 2012 and remained insured through the date of the ALJ's decision, August 27, 2014.  (Tr. 22.)  Therefore, in order to be entitled to DIB, Williams  must establish a continuous twelve month period of disability commencing between August 17, 2012 and August 27, 2014.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found that Williams established medically determinable, severe impairments, due to Crohn's disease, HIV infection, history of deep vein thrombosis, hypertension, and degenerative changes of the lumbar spine; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 22-23, 24-25.) Williams was found capable of performing her past work activities, as well as other jobs existing in the national economy, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Williams was not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

---

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

14

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

In her first argument, Williams claims the ALJ erred by concluding that she was capable of a reduced range of light work. She contends that the ALJ did not give appropriate weight to the medical source statements of her treating physician, Dr. Hanrahan. In her second argument, Williams asserted that the ALJ erred by failing to find that her mental impairment was severe. She predicates this argument on her 2012 suicide attempt and the report of the consultative examination performed by Dr. Whitlow.

### RFC Assessment

The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

In this case, the ALJ concluded that Williams had the residual functional capacity to perform light work, except for the following limitations: she is precluded from climbing ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch,

and crawl; she is precluded from concentrated exposure to temperature extremes, humidity, or environmental pollutants; and she should work in a setting that affords access to restroom facilities. (Tr. 25.)

In fashioning the RFC, the ALJ relied upon medical evidence in the record that substantiated only mild degenerative changes in her spine, hands, and feet, and revealed normal findings during physical examinations. In fact, Dr. Manocha diagnosed generalized arthritis, as opposed to rheumatoid or inflammatory arthritis. (Tr. 27.) The ALJ noted that, in addition to the mild nature of the examination results, the treatment for Williams' musculoskeletal pain had been conservative in nature and inconsistent with what would be expected in the case of an individual with her alleged mobility and upper extremity limitations. The ALJ cited the record to show that Williams reported significant pain relief from the nonsteroidal anti-inflammatory drugs and completed a short course of physical therapy. Insofar as no treating source prescribed narcotic pain medication or recommended surgical intervention for Williams' musculoskeletal pain, the ALJ opined that Williams' pain was controlled with a conservative course of treatment. *Id*.

In concluding that Williams was capable of light work, with additional limitations, the ALJ cited the medical records, which are replete with references to the effectiveness of Williams' HIV and Crohn's disease medications. (Tr. 26-27.)  The ALJ noted that there is no evidence of uncontrolled hypertension, Williams has not experienced any significant reoccurrence of DVT, and she has no edema of the lower extremities that would require significant rest or elevation. (Tr. 28.)

Next, the ALJ found that, although Williams purported to be in constant pain, she rarely reported her alleged pain to her treating physicians. (Tr. 28.) She was frequently described as feeling well, and her physical examinations yielded normal results. Finally, the ALJ concluded that Williams' activities of daily living were at odds with her allegations of disabling pain. She reported attending aerobics classes, riding her bike, and running on a treadmill. *Id*.

The ALJ accorded little weight to Dr. Hanrahan's medical source statements, which included significant postural and mental limitations. (Tr. 28.) The ALJ wrote, "This opinion is

16

unsupported by Dr. Hanrahan's own treatment notes, which demonstrated no complications for HIV and unremarkable musculoskelatal findings throughout the extremities, with no more than mild joint or spine tenderness, which would be unlikely to cause the extreme limitations set forth in [the medical source statements.]" *Id*. The ALJ further opined that Dr. Hanrahan's conclusion were at odds with Williams' statements at her medical appointments, as she often denied pain and described a wide range of daily activities and a relatively active lifestyle. *Id*. The ALJ likewise gave little weight to Dr. Hanrahan's conclusions about Williams' mental limitations because Dr. Hanrahan's medical notes contained examination findings of normal mood and affect, cooperativeness, and alertness during office visits. (Tr. 29.) Moreover, the ALJ noted that the record did not include any statements by Williams describing an inability to get along with others. *Id*.

The ALJ credited the opinion of the state agency physician, which he found to be consistent with the medical evidence in the record. The ALJ relied upon Williams' complaints of ongoing joint pain, but relatively normal physical findings, and no more than mild degenerative changes, to conclude that she was capable of a limited range of light work. (Tr. 29.)

### *Treating Physician - Dr. Hanrahan*

In her first argument, Williams asserts that the ALJ failed to give proper weight to the opinion of Dr. Hanrahan. Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed

using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]

    If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6ᵗʰ Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

    Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6ᵗʰ Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6ᵗʰ Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not

---

    [5] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The ALJ provided the following analysis of Dr. Hanrahan's conclusions regarding Williams' physical limitations:

> As for the opinion evidence, the undersigned has considered the medical source statements of Dr. Hanrahan, which indicated the claimant could lift up to five pounds, stand or walk up to one hour without interruption and four hours total, would have no difficulty sitting, could occasionally perform all postural activities, could occasionally perform reaching, pushing, pulling, fine manipulation, and gross manipulation, would be precluded from environmental extremes, and could experience pain that would take her off task, interfere with concentration, and cause absenteeism. (Exhibit B4F, B11F.) This opinion is unsupported by Dr. Hanrahan's own treatment records, which demonstrated no complications from HIV and unremarkable musculoskeletal functioning throughout the extremities, with no more than mild joint or spine tenderness, which would be unlikely to cause the extreme limitations set forth in this checklist statement. Further, this opinion is inconsistent with the claimant's own reports to Dr. Hanrahan, described above, which demonstrated she often denied pain and described a wide range of daily activities and relatively active lifestyle.

(Tr. 28.)

Here, the ALJ properly accorded little weight to Dr. Hanrahan's medical source statements because they were not supported by treatment notes, the objective evidence in the record, Williams' statements at her medical appointments, or her activities of daily living. A review of the relevant medical records reveals that Williams attended numerous follow-up visits in the Infectious Diseases, Gastroenterology, and Arthritis/Immunology Departments at MetroHealth. At the majority of these appointments, she reported feeling well, and her physical examinations yielded normal results. (Tr. 272-274, 357-358, 397-399, 581, 607-608.) Her HIV

19

and Crohn's disease were consistently described as well-controlled.  (Tr. 272-274, 399, 703, 710.)  Moreover, Williams reported participating in various physical activities, including aerobics classes, bicycle-riding, and walking and running on a treadmill.  (Tr. 707, 830, 1010.) The lack of evidence supporting Dr. Hanrahan's opinions is further demonstrated by her failure to provide any explanation for her conclusions in either of the medical source statements.

The ALJ did not err in according little weight to Dr. Hanrahan's conclusions in both medical sources statements, which were not supported by the record.  He provided good reasons for doing so.  Accordingly, the Court finds that the ALJ did not violate the treating physician rule and that the physical RFC is supported by substantial evidence.

### Step Two and Consulting Examiner

Turning to Williams' second argument, she asserts that the ALJ erred when he failed to find that her mental impairments were severe.  At step two of the disability analysis, the ALJ must determine whether the claimant has a severe impairment.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 404.1520(c).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) "[u]nderstanding, carrying out, and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and, (6) [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir. 1985).  *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96  3p, 1996 WL 374181 at *1.  After the ALJ makes a finding of severity as to even one impairment, the ALJ "must consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96  8p,
1996 WL 374184, at *5.  When the ALJ considers all of a claimant's impairments in the
remaining steps of the disability determination, the ALJ's failure to find additional severe
impairments at step two does "not constitute reversible error."  *Maziarz v. Sec'y of Health &
Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL
4981686 at * 2 (6th Cir. 2009); *Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22,
2008).

Here, the ALJ characterized Williams' depression as a nonsevere impairment.  (Tr. 22.)
The ALJ relied upon the fact that Williams did not undergo any formal mental health treatment,
although she was prescribed Celexa for depression.  (Tr. 22.)  The ALJ acknowledged that
Williams had been hospitalized on one occasion based upon what he described as "an isolated
incident of suicidal ideation related to a family-related argument."  (Tr. 22.)  However, he noted
that since that time, there had been no additional emergency treatment or hospitalization, and
there was no evidence that Williams reported ongoing mental health symptoms to any treating
sources.  Dr. Hanrahan did not document any significant mental health status abnormalities in her
treatment notes.  (Tr. 23.)  Williams, in turn, cites her 2012 suicide attempt and the consultative
examination report of Dr. Whitlow to argue that the ALJ's determination that Williams'
depression is a nonsevere impairment was not supported by substantial evidence.

ALJs "are not bound by any findings made by State agency medical or psychological
consultants, or other program physicians or psychologists."  20 C.F.R. § 404.1527(e)(2)(i).
Nonetheless, because "State agency medical and psychological consultants and other program
physicians, psychologists, and other medical specialists are highly qualified physicians,
psychologists," ALJs must consider their findings and opinions.  *Id*.

When doing so, an ALJ "will evaluate the findings using the relevant factors in
paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise
in our rules, the supporting evidence in the case record, supporting explanations the medical or
psychological consultant provides, and any other factors relevant to the weighing of the
opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the

weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.* However, "[i]n the absence of treating-source status . . .[courts] do not reach the question of whether the ALJ violated *Wilson v. Comm'r of Soc .Sec.*, 378 F.3d 541 (6th Cir. 2004), by failing to give reasons for not accepting their reports. " *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Here, the ALJ adequately explained the weight ascribed to Dr. Whitlow's consultative report. The ALJ analyzed Williams' depression at length when he considered the four broad functional areas set forth in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1.) With respect to the area of activities of daily living, the ALJ concluded that Williams has mild limitations. He cited her "wide level of activity and adaptive functioning," which included hobbies and physical activities, her ability to perform household chores, manage her finances, and navigate public transportation. The ALJ found no limitation in the area of social functioning, based upon Williams' interaction with her significant other and family, and her regular attendance at physicians' appointments and church. The ALJ recognized that, although Williams exhibited some agitation during the consultative exam, Dr. Whitlow acknowledged that she had no history of losing employment due to interpersonal problems, no legal difficulties, and she related cooperatively and pleasantly to treating sources. (Tr. 23.) The ALJ relied upon Dr. Whitlow's opinion that Williams would have no significant limitations in relating to others or responding to supervision at work. (Tr. 23-24.)

The ALJ found that Williams has mild limitation in the third functional area of concentration, persistence, and pace. The ALJ cited Dr. Whitlow's conclusion that Williams lacked persistence for tasks, but noted that Dr. Whitlow attributed Williams' lack of persistence to her physical problems, not her mental problems. The ALJ gave little weight to the unsigned and undated medical source statement (which he attributed to Dr. Hanrahan), because no corroborating clinical evidence was provided, and Dr. Hanrahan's medical notes did not document any complaints from Williams regarding depression. The ALJ also cited Dr.

Hanrahan's other medical sources statements, which attributed Williams' problems with concentration, persistence, and attendance, to physical pain, not depression. Finally, the ALJ recognized that Williams had no episodes of decompensation that had been for an extended duration. (Tr. 24.)

Although Dr. Whitlow characterized Williams' demeanor as "defensive and protective of herself and her self-image," (Tr. 624), Dr. Whitlow opined that Williams' cognitive functioning did not appear to be impaired. (Tr. 625.) Despite her conclusion that Williams' prognosis was poor, Dr. Whitlow found that Williams experienced no functional limitations in her ability to understand, remember, and carry out instructions, to maintain attention and concentration, persistence and pace to perform simple and multi step tasks, to respond to supervision and to coworkers, and to respond to work pressures. (Tr. 627-628.) Therefore, Williams has not offered any specific limitations that were not included in the RFC, because the ALJ adopted Dr. Whitlow's conclusions regarding her lack of functional mental limitations.

In summary, the ALJ concluded that Williams' depression constituted a nonsevere impairment, based upon Williams' conservative treatment for depression, her failure to report ongoing mental health symptoms to Dr. Hanrahan, and Dr. Hanrahan's failure to record any significant mental status abnormalities throughout her treatment notes. The ALJ predicated his conclusions regarding Williams' depression on Dr. Whitlow's opinion that Williams suffered no impairment in cognitive functioning, or in her ability to carry out instructions, maintain concentration and pace, and respond appropriately to supervisors and coworkers. To the extent Dr. Whitlow's report could have supported greater limitations than those ultimately adopted, the ALJ plainly rejected her conclusion. Although the ALJ did not expressly discuss Dr. Whitlow's opinion when formulating the RFC,[6] a plaintiff's mere disagreement with the weight an ALJ

---

[6] The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of*

23

ascribes to certain opinions does not provide basis for overturning the RFC determination. *Carter*, 2012 U.S. Dist. LEXIS 40828 at **21-22. Furthermore, in fashioning a hypothetical question based on the RFC, an ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). In earlier steps, the ALJ adequately discussed both Dr. Whitlock's and Dr. Hanrahan's opinions. Consequently, substantial evidence in the record supported the ALJ's decision that Williams' depression was not severe and did not warrant any work-related functional limitations.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision should be AFFIRMED.


s/ Greg White
United States Magistrate Judge

Date: November 10, 2015

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

*Soc. Sec.*, 2012 U.S. Dist. LEXIS 40828 at **21-22 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 807 (6th Cir. 2008)).

24